# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| WILMA ELEY, <br><br>           Plaintiff, <br><br>           v. <br><br> DISTRICT OF COLUMBIA, <br><br>           Defendant. | Civil Action No. 11-309 (BAH)(AK) <br><br> Judge Beryl A. Howell |

## MEMORANDUM OPINION

Pending before the Court is the plaintiff Wilma Eley's Motion for Attorney Fees and Costs, ECF No. 26, under the attorneys' fees provision of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i)(3)(B)(i)(I).  This motion was referred to a Magistrate Judge who issued a Report and Recommendation ("R&R"), ECF No. 34, to which both the plaintiff and the defendant District of Columbia objected.  *See* Pl.'s Objs. Rep. & Rec. of Mag. Judge Re. Attys. Fees ("Pl.'s Objs."), ECF No. 35; Def.'s Objs. Mag.'s Aug. 29, 2013 Rep. & Rec. ("Def.'s Objs."), ECF No. 36.  While the R&R recommended an award of $39,055.03 in attorney's fees, the plaintiff claims that she is entitled to an award of $62,225.00, Pl.'s Mot. for Fees & Costs ("Pl.'s Mot.") at 1, ECF No. 26, and the defendant argues that the award should be "reduced by 90%" to $2,900.62.  Def.'s Objs. at 21.  For the reasons set forth below, the plaintiff's objections are sustained, the defendant's objections are overruled, and the plaintiff's motion is granted.

## I.      BACKGROUND

The factual history of this case is set forth in greater detail in the Report and Recommendation regarding the underlying merits determination that was adopted by this Court.

*See Eley v. District of Columbia*, No. 11-309, 2012 WL 3656471, at *1–3 (D.D.C. Aug. 24, 2012).  Only the relevant facts and procedural history are summarized here.

### A.      The Underlying Merits Action

Prior to the 2010-2011 school year, the defendant "had not identified a location at which the student's IEP would be implemented."  Admin. Record ("AR") at 7 ¶ 5, ECF No. 9-1.[1]  In the absence of such a placement at the beginning of the 2010-2011 school year, the plaintiff enrolled the child as a "non-attending" student at his local public school and subsequently enrolled him at a private school in the District of Columbia.  *Eley*, 2012 WL 3656471, at *2. After school had begun in the Fall of 2010, the plaintiff filed an administrative due process complaint against the defendant, on September 13, 2010, "alleging that [the defendant] was twenty-three days late in preparing [the child's] new [Individualized Education Plan ("IEP")]." *Id.*  The defendant eventually produced a placement for the child in another private school and issued a "prior written notice" on October 7, 2010.  *Id.* at *3; AR at 12 ¶16.

The Hearing Officer assigned to the case found that "the Plaintiff failed to establish that DCPS substantively violated the IDEA and, even if she had proved it, her unilateral removal of [her child] was unreasonable."  *Eley*, 2012 WL 3656471, at *3.  The plaintiff timely filed this federal suit "requesting that the Court: 1) find that [District of Columbia Public Schools ("DCPS")] violated the IDEA and denied [the plaintiff's child] a free, appropriate public education ("FAPE"); 2) grant her reimbursement for [the child's] tuition at [the private school]; [and] 3) order prospective placement for [the child] at [the private school]."  R&R at 2.[2]

---

[1] The AR in this matter was filed on August 23, 2011, and the latest document included in the AR is the transcript of the underlying administrative hearing, dated October 21, 2010, from which this appeal was taken.

[2] The record indicates that the child attended a private school during the remainder of the 2010-2011 school year, AR at 11–12 ¶ 15,  but does not reflect where the child was enrolled for the following two school years in 2011-2012 and  2012-2013.

This Court found that the defendant violated the IDEA by denying the plaintiff's child a FAPE, and that the plaintiff's actions in unilaterally placing her child in a private school were "not unreasonable." *Eley*, 2012 WL 3656471, at *8–10. The case was remanded to a Hearing Officer "for the purpose of determining whether the $2,850 sought by the plaintiff as reimbursement [for private school tuition] is appropriate and reasonable." *Id*. at *10. The only relief the plaintiff sought that was not granted by this Court was her request for "prospective placement" of the child at the private school for 2012-2013 school year since such placement "should not be addressed for the 2012-13 school year by this Court but by the [multi-disciplinary team]/IEP team." *Id.* at *11. In view of the tardy actions by DCPS, which prompted the litigation in the first place, the Court cautioned that such a determination should "be done as soon as possible." *Id*. Consequently, the Court granted summary judgment to the plaintiff in part and denied it in part while denying summary judgment completely to the defendant. *Id.* at *1. On remand, the Hearing Officer ordered the defendant to "pay the Plaintiff the full $2,850 she sought." R&R at 3.

### B.    The Attorney Fees Report and Recommendation

The plaintiff timely filed her Motion for Attorney Fees and Costs, which was referred to a Magistrate Judge for a Report and Recommendation. *See* Order Referring Motion for Attorney Fees and Costs to a Magistrate Judge at 1, ECF No. 32. The R&R, filed on August 29, 2013, made the following findings: (1) the plaintiff was a "prevailing party" within the meaning of the IDEA and that a reduction in the plaintiff's attorney's fees "on the basis of limited success" was unwarranted; and (2) "the majority of Plaintiffs' [sic] fees were reasonably incurred." R&R at 6.

The parties timely objected to the R&R. *See* LCvR 72.3(b). The plaintiff objects to the recommendations that (1) the plaintiff's counsel's rates be reduced to seventy-five percent of the

standard rates provided under what is commonly called the "*Laffey* matrix;" (2) the plaintiff's counsel's time spent on the attorney's fees litigation be reduced by fifteen percent; and (3) the plaintiff's counsel's time of one-half hour spent in a "Resolution Session" be disallowed.  *See* Pl.'s Objs. *generally*.  The defendant objects to the R&R's findings that (1) the plaintiff prevailed in whole; and (2) the plaintiff is entitled to fees related to the Motion for Attorney Fees, described in the R&R as "Fees for Fees."  *See* Def.'s Objs. *generally*.  The objections have been fully briefed and are now ripe for consideration.

## II.    LEGAL STANDARD

Motions for attorneys' fees may be referred to a Magistrate Judge for a report and recommendation and any objections thereto are subject to *de novo* review by the district court. FED. R. CIV. P. 54(d)(2)(D) (stating that a court "may refer a motion for attorney's fees to a magistrate judge under Rule 72(b) as if it were a dispositive pretrial matter"); *see also David v. District of Columbia,* 252 F.R.D. 56, 58 (D.D.C. 2008) (noting "the limited jurisdiction granted by Congress to a magistrate judge in Federal Rules 54(d)(2)(D) and 72(b) to issue a recommendation on a motion for attorneys' fees").  Federal Rule of Civil Procedure 72(b) provides that "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to," and "may accept, reject, or modify the recommended disposition." FED. R. CIV. P. 72(b)(3); *see also* LCvR 72.3(c) ("A district judge shall make a *de novo* determination of those portions of a magistrate judge's findings and recommendations to which objection is made").

The IDEA provides that "the court, in its discretion, may award reasonable attorneys' fees . . . (I) to a prevailing party who is the parent of a child with a disability." 20 U.S.C. §1415(i)(3)(B)(i).  Courts follow a two-pronged inquiry to determine attorneys' fees under the

IDEA by, first, determining if the party seeking fees is a "prevailing party" and, then, determining what fees are "reasonable." *See id.*; *see also B.R. ex rel. Rempson v. District of Columbia*, 802 F. Supp. 2d 153, 162–63 (D.D.C. 2011).

With respect to the first prong, the Supreme Court has "long held that the term 'prevailing party' in fee statutes is a 'term of art' that refers to the prevailing litigant," reflecting "the fact that statutes that award attorney's fees to a prevailing party are exceptions to the 'American Rule' that each litigant bear [his] own attorney's fees." *Astrue v. Ratliff*, 560 U.S. 586, 130 S. Ct. 2521, 2525 (2010) (internal quotations and citations omitted; brackets in original). The Court has made clear that just because a party has "achieved the desired result because the lawsuit brought about a voluntary change in the defendant's conduct," does not trigger "prevailing party" status. *Buckhannon Bd. and Care Home, Inc. v. West Va. Dep't of Health and Human Resources*, 532 U.S. 598, 600 (2001) ("*Buckhannon*"). Rather, the "touchstone of the prevailing party inquiry" is "'the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute.'" *Sole v. Wyner*, 551 U.S. 74, 82–83 (2007) (quoting *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792–793 (1989)). In determining whether a party is the "prevailing party," the D.C. Circuit has interpreted *Buckhannon* as requiring a three part test: "(1) there must be a court-ordered change in the legal relationship of the parties; (2) the judgment must be in favor of the party seeking the fees; and (3) the judicial pronouncement must be accompanied by judicial relief." *Green Aviation Mgmt. Co., LLC v. FAA*, 676 F.3d 200, 203 (D.C. Cir. 2012) (quoting *Turner v. Nat'l Transp. Safety Bd.*, 608 F.3d 12, 15 (D.C. Cir. 2010) and *District of Columbia v. Straus*, 590 F.3d 898, 901 (D.C. Cir. 2010) (citing *Thomas v. Nat'l Science Found.*, 330 F.3d 486, 492–93 (D.C. Cir. 2003))); *see also District of Columbia v. Ijeabuonwu*, 642 F.3d 1191,

1193–1194 (D.C. Cir. 2011).  This "prevailing party" test applies generally to federal attorneys'

fee-shifting statutes, including the IDEA.  *See Straus,* 590 F.3d at 901 (applying three-part test to

IDEA case).

Determining the reasonable attorneys' fees to which a prevailing party is entitled entails a

three-part analysis: "(1) determination of the number of hours reasonably expanded [sic] in

litigation; (2) determination of a reasonable hourly rate or "lodestar"; and (3) the use of

multipliers as merited."  *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516, 1517

(D.C. Cir. 1988) ("*SOCM*") (citation omitted).  The fee applicant bears the burden of justifying

the attorneys' fees requested.  *See Covington v. District of Columbia*, 57 F.3d 1101, 1107 (D.C.

Cir. 1995) ("a fee applicant bears the burden of establishing an entitlement to an award,

documenting the appropriate hours, and justifying the reasonableness of the rates") (citing *Blum*

*v. Stenson*, 465 U.S. 886, 896 n.11 (1984)).  Thus, in IDEA attorneys' fees cases, the party

seeking fees must meet the *Thomas* test to show she is a prevailing party entitled to an award,

and the *SOCM* test to show the reasonableness of the number of hours expended and the hourly

billing rate.  *See Thomas*, 330 F.3d at 492; *In re North (Bush Fee Application)*, 59 F.3d 184, 189

(D.C Cir. 1995) ("[T]he fee petitioner bears the burden of establishing all elements of his

entitlement.").

To meet the latter burden, the plaintiff must submit evidence regarding "the attorneys'

billing practices; the attorneys' skill, experience, and reputation; and the prevailing market rates

in the relevant community."  *Covington*, 57 F.3d at 1107.  Upon submission of such information,

a presumption applies that the number of hours billed and the hourly rates are reasonable.

*Jackson v. District of Columbia*, 696 F. Supp. 2d 97, 100–101 (D.D.C. 2010) (citing *Blackman v.*

*District of Columbia*, 677 F. Supp. 2d 169, 172 (D.D.C. 2010)).  The burden then shifts to the

defendant "to provide specific contrary evidence tending to show that a lower rate would be appropriate." *Covington*, 57 F. 3d at 1109–10 (quoting *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1326 (D.C. Cir. 1982) ("*Concerned Veterans*")); *see also Rooths v. District of Columbia*, 802 F. Supp. 2d 56, 59–60 (D.D.C. 2011); *Jackson*, 696 F. Supp. at 100–101.

## III.   DISCUSSION

Two portions of the fee award recommended in the R&R are not objected to by either party: first, that three hours of attorney travel time are properly reimbursable at half the reasonable rate and, second, that the plaintiff's attorney may rightfully invoice clerical and non-legal work performed by the attorney. *See* Pl.'s Objs. *generally*; Def.'s Objs. *generally*. Therefore, the R&R's findings as to these aspects of the attorney's fee award are adopted. *See* R&R Parts II.C., II.E.

The parties object to four findings in the R&R: (1) whether the plaintiff's attorney's fee award should be reduced for "partial success;" (2) what hourly rate is appropriate for measuring the attorney's fees; (3) whether the awarding of "fees for fees" in IDEA litigation is appropriate and, if so, the reasonableness of the number of hours requested for this part of the award; and (4) whether the half hour the plaintiff's attorney spent in a purported Resolution Session on September 27, 2010 is properly included in an award for the attorney's fees. *See* Pl.'s Objs. *generally*; Def.'s Objs. *generally*. Each disputed issue is discussed separately below.

### A.   The Plaintiff's Degree Of Success Warrants No Reduction In Fees

The IDEA allows the award of "reasonable attorneys' fees" to a "prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B)(i)(I). Here, it is undisputed that the plaintiff is "the parent of a child with a disability," but the defendant argues that the

plaintiff barely qualifies as a prevailing party, stating that she "prevailed on zero claims at the administrative level, and only a fraction of her claims on appeal." Def.'s Objs. at 5. The defendant contends that the plaintiff's attorney's fee award must be reduced commensurate with her limited degree of success. *Id.* at 7. For the reasons discussed below, the Court disagrees with the defendant's fundamental premise regarding the plaintiff's success in this litigation.

At the outset, the law is well-settled that where a plaintiff has not prevailed on every claim asserted, "the *degree* of the plaintiff's success in relation to the other goals of the lawsuit is a factor critical to the determination of the size of the reasonable fee." *Tex. State Teachers Ass'n*, 489 U.S. at 790 (emphasis in original). Thus, "[a] plaintiff's overall success on the merits . . . must be considered in determining the reasonableness of a fee award." *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 470 F.3d 363, 369 (D.C. Cir. 2006) (citing *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)). If a plaintiff "presents 'distinctly different claims for relief that are based on different facts and legal theories,' the limit on awards to 'prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim." *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434–35 (1983)). In evaluating the "degree" of success, "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 435. At the same time, the Supreme Court has cautioned that "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee; . . . the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Id.*

In this action, the plaintiff sought relief in four substantive areas: a declaratory judgment that the defendant violated the FAPE; an order requiring the defendant to reimburse the plaintiff

for "costs incurred providing for [the child's] education through [the private school[;]" "an Order

to fund [the child's] education at [the private school;]" and attorneys' fees and costs.  Compl. at

5, ECF No. 1.[3]  The plaintiff obtained the full relief she requested in three out of the four areas:

namely, a declaration that the defendant violated the IDEA and denied her child a FAPE; an

order for the defendant to reimburse the plaintiff for the private school costs; and the defendant

concedes that at least some attorneys' fees are warranted.  *See Eley*, 2012 WL 3656471, at *8–9

(holding defendant denied the plaintiff's child a FAPE); *id.* at 10 (ordering remand to hearing

officer to determine if $2,850 in private school tuition payments made by the plaintiff were

reasonable); Def.'s Objs. at 7 (arguing plaintiff's attorney's fees should be reduced, but not

arguing such attorney's fees should be eliminated).  The only claim on which the plaintiff did not

prevail in full was her request for "an Order to fund [the child's] education at [the private

school]."  Compl. at 5.

Notwithstanding the plaintiff's success, the defendant contends that the plaintiff is not a

prevailing party in whole because she failed to obtain "prospective permanent placement" at the

private school where she was forced to enroll her child when the defendant violated the IDEA

and failed to provide the child with an opportunity to obtain a FAPE.  Def.'s Objs. at 6.  The

defendant posits that, because the plaintiff was reimbursed for private school tuition for one tenth

of the school year, she was only ten percent successful and, consequently, her fee award should

be reduced by ninety percent.  *Id.* at 7.  This conclusion is unsupported by the record.

Parts of the plaintiff's requested prospective relief, encompassing the 2010-2011 and

2011-2012 school years were moot because those years had already occurred by the time this

action was resolved.  *See Eley*, 2012 WL 3656471, at *11; R&R at 5 ("The Court only denied

---

[3] The plaintiff also requested "all other relief the Court deems just," which is a "catch-all" provision that the Court
does not consider when determining the degree of the plaintiff's success.

one of the Plaintiff's requests, and that was because it was rendered moot, not because it lacked

merit."). As for the child's placement for the 2012-2013 school year, the Court found that the

"issue of prospective placement generally arises . . . only after the IEP has been properly

completed and the parent wishes to remove the student from the IEP's recommended location."

*Eley*, 2012 WL 3656471, at *11. Since "there [was] no indication in the record of the

preparation of an IEP for the 2012-13 school year . . . [p]rospective placement" should be

addressed by the school's team "as soon as possible." *Id.* The defendant's implication that the

Court "denied Plaintiff's request for *prospective* and *permanent* placement," Def.'s Objs. at 9

(emphasis in the original), on the merits mischaracterizes the record; instead, the Court found the

claims moot for two school years and urged prompt action by the defendant for the upcoming

school year.

       To bolster its argument that the plaintiff failed to obtain a significant portion of the relief

sought and should have her attorney's fee award reduced accordingly, the defendant states that

the plaintiff "took the risk of seeking not only reimbursement at the administrative level, but also

prospective placement." *Id.* at 9. The defendant relies upon *Hensley* and its progeny as support

for this position, but that reliance is misplaced.

       The Supreme Court held in *Hensley* that there are times when a plaintiff's "partial or

limited success" could make the standard lodestar amount of attorneys' fees derived from "the

product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate

[to] be an excessive amount." *Hensley*, 461 U.S. at 436. It did not state that such a reduction

was mandatory and specifically rejected "a mathematical approach comparing the total number

of issues in the case with those actually prevailed upon." *Id.* at 435 n.11. The Supreme Court

went on to hold that "[t]here is no precise rule or formula for making these determinations" and

that "[the District] court necessarily has discretion in making this equitable judgment" in light of the "degree of success obtained." *Id.* at 436–37.  The approach the defendant urges of reducing the fee award by the ninety percent of the school year for which no reimbursement was ordered is the kind of "mathematical approach" the Supreme Court expressly rejected in *Hensley*.

Moreover, contrary to the premise of the defendant's argument, the plaintiff appears to have obtained the relief she sought of prospective placement in a private school since the prospective placement belatedly provided by the defendant six weeks after the school year started, was itself a private school.  *See* AR at 12 ¶ 16 ("Private school number two, the location and/or school provided by [the defendant] on October 7, 2010 is a private school that is able to implement the student's IEP.").  Based upon these facts, the Court rejects the defendant's proposition that the plaintiff adopted a "risk[y]" position by seeking a private school placement for her child when the defendant itself recommended a private school, albeit a different one than the one chosen by the plaintiff.  As the Court previously concluded, the plaintiff's response was both understandable and appropriate when the school system failed to abide by federal law and provide an alternative placement before the plaintiff initiated this lawsuit.  *See Eley*, 2012 WL 3656471, at *10 ("The Court therefore finds that plaintiff's actions and conduct were not unreasonable.").  The plaintiff's reasonable demands and the substantial success she obtained in this action make her a prevailing party such that a reduction in attorneys' fees for lack of success is unwarranted.

The defendant's objection to the R&R on this issue is therefore overruled.

**B.     The Reasonableness Of The Plaintiff's Attorney's Rates**

Under the three-part *SOCM* test for determining a reasonable fee, the parties do not dispute the number of hours reasonably expended in this litigation, except the relatively small

number of hours discussed in Parts III.C and D, *infra*, and no multiplier may be requested or

awarded under the IDEA. 20 U.S.C. 1415(i)(3)(C) ("No bonus or multiplier may be used in

calculating the fees awarded under this subsection."). Thus, the only prong of this test at issue in

this case is the determination of the reasonable hourly rate. To establish a reasonable hourly rate,

the plaintiff must show "at least three elements": "[1] the attorneys' billing practices; [2] the

attorneys' skill, experience, and reputation; and [3] the prevailing market rates in the relevant

community." *Covington*, 57 F.3d at 1107. Each of these elements is discussed below.

The defendant makes a perfunctory challenge to the first element regarding the plaintiff's

attorney's billing practices by discounting the plaintiff's counsel's sworn affidavit that he has

clients who have paid his requested hourly rate in full and citing instead to the plaintiff's

"rel[iance] on a select sample of fees awarded to attorneys by courts in this jurisdiction." Def.'s

Opp'n Pl.'s Objs. to Mag.'s Report & Rec. On Attys.' Fees ("Def.'s Opp'n") at 3, ECF No. 37.

The defendant then leaps to the conclusion that such reference amounts to an admission "that her

attorney, like other attorneys practicing in this field in this community, has only one paying

client – the District of Columbia." *Id*. Based upon this purported admission, the defendant then

sets up a classic "straw man," construing the plaintiff's argument to be "that attorneys who have

no paying clients can create a market by simply declaring their desired rates and asking the

courts to order that those rates be paid by the government," thereby "allow[ing] an unfettered

setting of rates by the attorneys themselves." *Id*. Yet, this "straw man" argument ignores the

plaintiff's counsel's clear attestation that, while he has "billed DCPS for IDEA attorney's fees

for hundreds of cases from 2006 through 2008" at "hourly rates perfectly matching the adjusted

*Laffey* matrix," he has also charged those same rates to "clients who pay the firm those rates

directly, regardless of whether reimbursement is ever obtained." Pl.'s Mot. Ex. 2 ("Verified

Statement of Douglas Tyrka") ("Tyrka Aff.") ¶¶ 9–10, ECF No. 26-3.  As the plaintiff notes, the defendant "appears to be arguing a different case, discussing a different law firm at length and defending itself against an argument that Ms. Eley has never made."  Pl.'s Response to Def.'s Objs. to R&R of Mag. J. Re. Attys' Fees ("Pl.'s Opp'n") at 5 n.1, ECF No. 38.  In sum, as to the first element, the Court finds that the plaintiff has sustained her burden of showing her counsel's billing practice is to bill at rates commensurate with the rates requested in this fee petition. Consequently, consideration of this element warrants no reduction—or increase—over the prevailing market rate in this community.

With respect to the second element, the R&R found, and the defendant does not dispute, that the "Plaintiff's attorney's knowledge of IDEA law, experience, and understanding of the procedural aspects of the due process hearing and federal litigation process helped him obtain a favorable decision for his client."  R&R at 9.  Indeed, the plaintiff's counsel's affidavit summarizes his experience in litigating over 1,000 IDEA administrative cases and twenty IDEA federal cases for the last decade, with special education law accounting for "at least 95% of [his] practice" and that of his law firm.  Tyrka Aff., ¶ 15.  Thus, the Court finds no reason to reduce or increase the prevailing market rates in this community for this element.

The principle dispute about the reasonableness of the requested attorney's fee in this case is over the third element, the "prevailing market rate in this community."  *See Covington*, 57 F.3d at 1107The plaintiff raises two primary objections to the R&R's rejection of her requested "reasonable" rate, which is based on a version of what is commonly called the *Laffey* matrix of prevailing legal rates in the community.  First, the plaintiff objects to the R&R's finding that the version of the *Laffey* matrix submitted by the plaintiff was "elevated."  Pl.'s Objs. at 2.  Second, the plaintiff objects to the R&R's finding that compensation at the full *Laffey* rate is

inappropriate because this case was not sufficiently "complex" to warrant such full compensation. *Id.* The Court first determines which version of the *Laffey* matrix is appropriate to use in the instant matter before turning to a discussion of whether the full *Laffey* rate should be applied.

### 1.     *Use Of An Updated Laffey Matrix Is Appropriate*

The plaintiff submitted with her original Motion for Attorney Fees "an updated version of the *Laffey* matrix," which was "developed by an expert economist," Michael Kavanaugh, Ph.D., who uses the Legal Services Index ("LSI") component of the Consumer Price Index ("CPI") to account for inflation as applied to the most recent available survey of legal hourly rates in the Washington, D.C. area. Pl.'s Mot. at 8; *see* Pl.'s Mot. Ex. 3, ECF No. 26-4 (matrix); Pl.'s Mot. Exs. 4(a-c), ECF Nos. 26-5, 26-6, 26-7 (expert declaration describing methodology for calculating matrix, expert's CV, and matrix, respectively). This is the same version of the *Laffey* matrix relied upon in *Salazar v. District of Columbia*, 123 F. Supp. 2d 8 (D.D.C. 2000), which the Court will refer to as the "LSI-adjusted matrix")*. See* Pl.'s Mot. Ex. 4(a) ¶¶ 4, 7. The R&R describes the plaintiff's requested rate as "elevated," presumably because the rates in the LSI-adjusted matrix are higher than those in the *Laffey* matrix released by the District of Columbia U.S. Attorney's Office.[4]  *See* R&R at 9; Laffey Matrix *available at* http://www.justice.gov/usao/dc/divisions/Laffey_Matrix_2003-2013.pdf ("USAO matrix").

The variation in the hourly legal billing rates reflected in the LSI-adjusted matrix and the USAO matrix is due to two methodological differences: first, the USAO matrix and the LSI-adjusted matrix use as starting points billing rate surveys conducted at different times; and,

---

[4] The defendant characterizes as "nothing but unsupported conjecture," Def.'s Opp'n at 1, the plaintiff's view that the R&R deemed the requested LSI-adjusted rates as "elevated" merely because they are higher than the USAO matrix. This Court concurs in the plaintiff's "conjecture" as the only logical conclusion to be reached, absent any other analysis or discussion of the reasons for rejecting the LSI-adjusted rates.

second, in order to provide an approximation of current billing rates, an inflation adjustment

derived from different parts of the CPI compiled by the Bureau of Labor Statistics ("BLS") is

applied to the rate survey information.  *See Heller v. District of Columbia*, 832 F. Supp. 2d 32,

41 (D.D.C. 2011) (explaining differences between the two surveys).

The USAO matrix uses as its starting point the hourly legal billing rates in effect over

thirty years ago "for work done principally in 1981-82," since this matrix was initially prepared

in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983).  *See* USAO matrix ¶ 2.

These billing rates are increased each year by applying "changes in the cost of living . . .

measured by the Consumer Price Index for All Urban Customers (CPI-U) for Washington-

Baltimore, DC-MD-VA-WV, as announced by the Bureau of Labor Statistics for May of each

year."  *See* USAO Matrix at ¶ 3.  In comparison, the LSI-adjusted matrix is based on a survey of

legal rates in the Washington, D.C. area conducted in 1989 in connection with a settlement in

*SOCM*.  *See Heller*, 832 F. Supp. 2d at 41; *Trout v. Ball*, 705 F. Supp. 705, 709 n.10 (D.D.C.

1989) (noting *Laffey* matrix prepared in *SOCM* "provide[s] an accurate and updated schedule of

attorney fees in this District."); Pl.'s Mot. Ex. 4a, Decl. of Dr. Michael Kavanaugh, Ph.D.

("Kavanaugh Decl.") ¶ 6, ECF No. 26–5 (explaining origin of LSI-adjusted matrix); *see also*

*Covington v. District of Columbia*, 839 F. Supp. 894, 898 (D.D.C. 1993) (noting differences

between "updated *Laffey* fee matrix" and USAO matrix and including full matrices in

appendices).  The LSI-adjusted matrix also uses a measure of inflation that is based upon the

more precise change in the nationwide cost of legal services as measured by the LSI.  *See*

Kavanaugh Decl. ¶ 6 and ¶ 6 n.3.  At the time that the LSI-adjusted rate was used in 2000, the

court compared those rates with three separate surveys of rates in the District of Columbia

prepared in 1998 and 1999 by the National Survey Center, the *National Law Journal* and the

*Legal Times* and found that they were "generally consistent with and corroborative of the rates" requested by the plaintiff. *Salazar*, 123 F. Supp. 2d at 14.

The D.C. Circuit has recognized that "fee matrices are somewhat crude," noting in particular that the *Laffey* matrix "lumps attorneys with four to seven years of experience in the same category; attorneys with eleven to nineteen also share the same hourly rate." *Covington,* 57 F.3d at 1109. Nevertheless, in fixing the prevailing rates for legal services, "plaintiffs must produce data concerning the prevailing market rates in the relevant community for attorneys of reasonably comparable skill, experience, and reputation," with "the matrices [] provid[ing] a useful starting point," as "supplement[ed]" by any matrix that has been offered. *Id.* To make this requisite showing, the D.C. Circuit has endorsed the use of the *Laffey* matrix, but subject to the clear caveat that the rates used must be "for the year to which it applies." *SOCM*, 857 F.2d at 1525. The court has stressed the importance of using timely prevailing rate information, stating "[p]erhaps the most desirable result of the present litigation would be the compiling of a similar schedule of prevailing community rates for other relevant years." *Id*. Thus, in this jurisdiction, plaintiffs may "point to such evidence as an updated version of the *Laffey* matrix[5] or the U.S. Attorney's Office matrix, or their own survey of prevailing market rates in the community," without expressing a preference for any particular method. *See Covington,* 57 F.3d at 1109.

Typically, prevailing parties offer one of three matrices in support of their fee petitions, each of which differs based upon two variables: the inflation calculation and the age of the survey to which the inflation calculation is applied. *See, e.g.*, *Covington v. District of Columbia*,

---

[5] The D.C. Circuit's reference in this quotation to "an updated version of the *Laffey* matrix" was to the evidence of prevailing D.C. legal rates derived from a 1989 survey used to settle the *SOCM* case. *See Covington*, 57 F.3d at 1105 (citing *Hatfield v. Garrett*, EEOC Doc. No. 01892909, 1989 WL 1007832, at *9 (EEOC Dec. 12, 1989) (describing updated matrix as that used to settle litigation in *SOCM* following remand)); Kavanaugh Decl. ¶ 6 (describing matrix used to settle *SOCM* case as "a new survey of rates in the Washington D.C. area"); *see also Heller*, 832 F. Supp. 2d at 41 (describing 1989 matrix).

839 F. Supp. 894, 898 (D.D.C. 1993); *Salazar*, 123 F. Supp. 2d at 14–15.  The USAO matrix

uses the original 1981 survey conducted in *Laffey v. Northwest Airlines, Inc.*, and applies to this

survey data an inflation calculation based upon the Washington, D.C. metropolitan area CPI for

all goods and services.  *See* USAO matrix ¶¶ 1–2.  In the early 1990s, an updated version of the

*Laffey* matrix was generated as part of a settlement in *SOCM*, based upon a survey of legal

billing rates through 1989 (the "1989 survey").  *See Covington*, 839 F. Supp. at 898; *Hatfield v.

Garrett*, EEOC Doc. No. 01892909, 1989 WL 1007832, at *9 (EEOC Dec. 12, 1989).  This 1989

survey data, to which the same CPI index used in the USAO matrix was applied to calculate the

market rates for the year in question, was relied upon in some cases in this jurisdiction as the

prevailing market rate.  *See, e.g.*, *Sexcius v. District of Columbia*, 839 F. Supp. 919, 924 (D.D.C.

1993) (discussing use of "updated" *Laffey* matrix).  Finally, in *Salazar*, the court adopted the

LSI-adjusted matrix which uses the 1989 rate survey and applies changes in the nationwide LSI

component of the CPI to calculate inflation.  *See Salazar*, 123 F. Supp. 2d at 14–15.

　　　　Here, the plaintiff has proffered the LSI-adjusted matrix, Pl.'s Mot. Ex. 3, which has met

with approval in several cases within and without this District.  *See, e.g.*, *Salazar*, 123 F. Supp.

2d at 14–15 ("[T]he [LSI-adjusted] *Laffey* index has the distinct advantage of capturing the more

relevant data because it is based on the legal services component of the Consumer Price Index

rather than the general CPI on which the U.S. Attorney's Office matrix is based.");  *Salazar v.

District of Columbia* ("*Salazar II*"), 750 F. Supp. 2d 70, 73 (D.D.C. 2011) (noting

"'[e]conomists use as specific an index as possible to determine changes in prices in a part of an

industry' and therefore 'components of the Consumer Price Index are the better tool to use to

update an industry's prices rather than the entire Consumer Price Index'" and that "Defendants'

main justification for seeking a change in the calculation of the updates of attorneys' fees

indexes is the fact that the U.S. Attorney's Office Matrix produces lower rates"); *Smith v. District of Columbia*, 466 F. Supp. 2d 151, 156 (D.D.C. 2006) (finding LSI-adjusted matrix use reasonable and noting that "[w]hile the [LSI-adjusted] *Laffey* matrix was, as of 2003, somewhat more generous to counsel than the USAO Matrix, it was also more accurate"); *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 726 F.3d 403, 416 (3d Cir. 2013) (upholding use of LSI-adjusted matrix for determining billing rates in Washington, D.C. area).[6]

The LSI-adjusted matrix has been subject to criticism.  *See Am. Lands Alliance v. Norton*, 525 F. Supp. 2d 135, 149–50 (D.D.C. 2007) (declining to depart from the "standard *Laffey* Matrix rates published by the United States Attorney's Office" after determining such rates are the "benchmark" for reasonable fees); *Muldrow v. Re-Direct, Inc.*, 397 F. Supp. 2d 1, 4 (D.D.C. 2005) (declining to adopt LSI-adjusted matrix in "a relatively straightforward negligence suit" and classifying adjusted rates as "extreme high-end fees").

Two major criticisms of the LSI-adjusted matrix have emerged in thoughtful analyses by Judges in this District: first, the USAO matrix is viewed as a more accurate assessment of attorney hourly rates in the Washington, D.C. metropolitan area because it is based on the local CPI, *see Miller v. Holzmann*, 575 F. Supp. 2d 2, 17–18 (D.D.C. 2008) *amended and vacated in part on other grounds sub nom. U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 786 F. Supp. 2d 110 (D.D.C. 2011); and, second, the LSI-adjusted matrix is deemed to be accurate only for rates charged at the largest law firms, *see Heller*, 832 F. Supp. 2d at 45–46.  The first criticism is predicated on the undisputed fact that the USAO matrix is adjusted based on "price inflation within the local community" while the LSI-adjusted matrix is premised upon "national

---

[6] This Court used the USAO matrix in *Thomas v. District of Columbia*, 908 F. Supp. 2d 233, 248 (D.D.C. 2012), where neither party objected to the portion of the Report and Recommendation adopting it as the appropriate rate. *See Thomas*, 908 F. Supp. 2d at 248 ("The parties have neither briefed this issue nor presented evidence regarding which *Laffey* matrix would be appropriate.").

inflation trends." *See Miller*, 575 F. Supp. 2d at 17–18; *see also Woodland v. Viacom, Inc.*, 255 F.R.D. 278, 280 (D.D.C. 2008).  Since the Supreme Court and the D.C. Circuit have made it clear that the appropriate factor to consider in attorneys' fees litigation is the prevailing community rate, the matrix adjusted by the general Washington, D.C. metropolitan area CPI, at first blush, appears to meet this criteria.  *See id.*  Yet, the local CPI for all goods and services includes such diverse items as personal computer prices, funeral expenses, and movie tickets and, therefore, heavily masks the changes in rates for legal services.[7]  *See* U.S. BLS, *Frequently Asked Questions, What goods and services does the CPI cover?*, http://stats.bls.gov/cpi/cpifaq.htm#Question_7.  The BLS does not provide a break down at the local level of price changes for specific goods and services such as legal services.  *See* U.S. BLS, *Overview, Consumer Price Indexes, Data Available*, Oct. 16, 2001, http://www.bls.gov/cpi/cpiovrvw.htm#item1.  Such a breakdown in price changes locally for legal services would, of course, be the most helpful indicator of the appropriate inflation calculation to apply to the rate survey data.  Thus, the USAO matrix is based on a logical assumption, namely, that the rate for legal services in the Washington, D.C. area increases in lockstep with the overall rise in the cost of all goods and services, including pizza delivery and cleaning services, for the area.  *See* USAO matrix.  There is simply no evidence, however, that this is, in fact, a correct presumption.

On the contrary, the BLS CPI shows that the cost of legal services nationally has far outstripped the increase in overall prices.  The nationwide cost of legal services has jumped ninety-one percent, nearly twice as much as the general CPI, since 1997.  *See* U.S. BLS, *CPI – All Urban Customers, Nationwide Area: Legal Services*, http://data.bls.gov/cgi-bin/srgate (enter

---

[7] The Court may take judicial notice of facts that can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  FED. R. EV. 201(b)(2); *see also Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (taking judicial notice of facts available on government website).

"CUUR0000SEGD01 " into text box; click the "Next" button; under the Specify Year Range

button, select "1997" from the "From:" drop down menu; click the "Retrieve Data" button).

Considering that the Washington, D.C. market is ranked third nationally for the highest cost of

legal services, behind only New York and San Francisco, a nationwide average for the cost of

legal services logically would be expected to underestimate the rates charged in this area.  *See*

Catherine Dunn, *Comparing Firm Billing Rates by Practice, City, Size*, CORPORATE COUNSEL,

July 15, 2013 ("CORPORATE COUNSEL Survey") (citing nationwide survey of invoices submitted

by more than 4,800 United States law firms that encompassed "29.1 million hours billed by

partners, associates, and paralegals" to develop nationwide and metropolitan area average hourly

rates for attorneys).  Indeed, the LSI-adjusted rates are corroborated by recent survey data

reported in a major legal publication for partners nationwide and broken down by city.  *Id.*  This

survey, reported in *Corporate Counsel* magazine, revealed that the average hourly rate in 2013

for a law firm partner in the Washington, D.C. market is $649.24 per hour, *id.*, which is $25 per

hour higher than the highest rate the LSI-adjusted matrix predicts for an attorney with between

eleven and nineteen years of experience, *see* LSI-adjusted matrix, and more than two hundred

dollars more per hour than the corresponding rate in the USAO matrix.  *See* USAO matrix.

      Still, courts have rejected the LSI-adjusted matrix due in large part to concern that the use

of the national LSI CPI changes are not sufficiently tied to this community to reflect reasonable

rates for lawyers practicing here.  *See, e.g.*, *Miller*, 575 F. Supp. 2d at 17–18.  In other words,

these courts have rejected the assumption inherent in the LSI-adjusted rate that the legal rates in

Washington, D.C. rise at the same rate that they rise nationally.  This assumption would, in fact,

be undermined if general cost changes in the Washington, D.C. area were appreciably different

from those in the rest of the United States, but the CPI indicates that is not the case.  Rather,

general consumer prices in the Washington, D.C. region have generally kept pace with those of

the nation as a whole.  According to the most recent data available, the overall nationwide CPI

has risen approximately forty-four percent since 1997, the earliest year for which data specific to

the Washington D.C. market is available.  *See* U.S. BLS, *CPI – All Urban Customers,*

*Nationwide Area*, http://data.bls.gov/cgi-bin/srgate (enter "CUUR0000SA0" into text box; click

the "Next" button; under the Specify Year Range button, select "1996" from the "From:" drop

down menu; click the "Retrieve Data" button).  In the Washington, D.C.-Baltimore, Maryland

Metropolitan Area, the overall CPI has risen by fifty percent, or slightly more than the national

average.  *See* U.S. BLS, *CPI – All Urban Customers, Washington, DC-Baltimore, MD Area*,

http://data.bls.gov/cgi-bin/srgate (enter "CUURA311SA0" into text box; click the "Next" button;

under the Specify Year Range button, select "1996" from the "From:" drop down menu; click the

"Retrieve Data" button).

      The question, therefore, is which assumption carries more logical force: (a) the

assumption underlying the USAO matrix that the rate of increase in the cost of legal services in

the Washington, D.C. area is generally the same as the costs for all other costs of goods and

services in the area; or (b) the assumption underlying the LSI-adjusted matrix that the increase in

the cost of legal services in the Washington, D.C. market generally matches the increases in

those costs nationally.  While there is no evidence that the cost of legal services increases in

lockstep with the cost of other goods and services, the CPI indicates the cost of legal services

rises much faster nationally.  Moreover, there is evidence that the Washington, D.C. area

generally sees price increases at or above the national average for all services.  Thus, as between

the two assumptions, it appears more likely that the cost of Washington, D.C. area legal services

is rising at a rate closer to the national average than that such costs are rising at the same rate as

the cost of all goods and services locally.  Indeed, considering that Washington, D.C. is among the most expensive legal services markets in the country, *see* CORPORATE COUNSEL Survey, it would appear that the use of a nationwide legal services index is, if anything, likely to underestimate the costs of local legal services because such a rate is an average of all costs nationwide.  In short, the LSI-adjusted matrix is probably a *conservative* estimate of the actual cost of legal services in this area, but at the very least it appears to be a more accurate reflection of the cost of legal services both in this community and nationwide.

The second major criticism of the LSI-adjusted matrix is that it is only indicative of "the prevailing market rates for attorneys engaged in complex federal litigation . . . [in] the 'big firm' context."  *Heller*, 832 F. Supp. 2d at 45.  Central to this criticism is the assumption that "[t]he market generally accepts higher rates from attorneys at firms with more than 100 lawyers than from those at smaller firms-presumably because of their greater resources and investments, such as attorneys, librarians, researchers, support staff, information technology, and litigation services."  *Wilcox v. Sisson*, No. 02-1455, 2006 WL 1443981, at *2 (D.D.C. May 25, 2006).  While this may be true, such differentiation has been explicitly rejected by the Supreme Court and the D.C. Circuit.

In *Blum*, 465 U.S. at 889, the Supreme Court considered whether non-profit attorneys who represented prevailing parties in civil rights litigations should be eligible for the same attorneys' fees rates that for-profit counsel could claim.  *Blum*, 465 U.S. at 889.  The Solicitor General argued in that case that "market rates incorporate operating expenses that may exceed the expenses of nonprofit legal services organizations, and include an element of profit unnecessary to attract nonprofit counsel."  *Id.* at 893.  After examining the legislative history of the fee-shifting statute at issue in that case, 42 U.S.C. § 1988, the Supreme Court determined that

Congress "intended that the amount of fees award under [§ 1988 to] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases[,] and not be reduced because the rights involved may be nonpecuniary in nature." *Id.* The Supreme Court held that "'reasonable fees' . . . are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel." *Id.* at 895.

Similarly, in *SOCM*, the D.C. Circuit confronted the question of whether private firms that typically charged reduced rates for certain types of litigation should be required to accept lower fees than they would charge other clients. *SOCM*, 857 F.2d at 1520. The Circuit acknowledged the "anomalous result" where "[t]he highly paid commercial, for-profit law firm can receive awards equal to its usual handsome rates" while a "legal aid attorney, tied to the prevailing market rate analysis of *Blum*, can look to the purely for-profit firm for evidence supporting a market rate calculation and receive the awards consistent with those of [t]he highest paid law firm in town" and "attorneys whose practice partakes of some elements of each of those two entities will receive fee awards often significantly smaller than those calculated on the common basis of the other two." *Id.* (internal citations and quotation marks omitted, alteration in original). After examining the policy underpinnings of fee-shifting statutes, the *SOCM* court stated unequivocally that "the prevailing market rate method heretofore used in awarding fees to traditional for-profit firms and public interest legal services organizations shall apply as well to those attorneys who practice privately and for profit but at reduced rates reflecting non-economic goals." *Id.* at 1524.

The same "anomalous result" is countenanced by applying the LSI-adjusted rates solely to cases brought by the largest law firms. If, for instance, a large, Washington, D.C. based law

firm were to undertake an IDEA case on a pro bono basis, or on a reduced rate, the firm's lawyers would presumably be able to obtain reimbursement at "its usual handsome rates." Yet, a firm that has chosen to specialize in IDEA litigation, furthering the nonpecuniary goals of defending the civil rights of children with special needs, would be subject to a lower fee because that firm is not a "top major law firm."[8]  *See Heller*, 832 F. Supp. 2d at 46.

In the instant case, especially, such a result would be unjust since the plaintiff's counsel states in his sworn affidavit that he has "always matched [his] hourly rates to those in what is commonly known as 'the adjusted *Laffey* matrix.'" Pl.'s Mot. Ex. 2, ¶ 7, ECF No. 26-3.  His firm has "had clients who pay the firm those rates directly, regardless of whether reimbursement is ever obtained." *Id.* ¶ 9.  Thus, not only are the LSI-adjusted rates more accurate than the USAO matrix, *see supra*, they have the added benefit, in this case, of being the rate actually charged by the attorney who performed the successful work being compensated.  The defendant has only a one-line response to this declaration, stating that it is "insufficient to establish that it is the prevailing market rate in the community."  Def.'s Opp'n to Pl.'s Objs. to Mag. Judge's Rep. & Rec. on Attys.' Fees ("Def.'s Opp'n") at 3, ECF No. 37.  To the contrary, the plaintiff's counsel's declaration, as well as the plaintiff's expert's declaration explaining the methodology and rationale for the updated rates, demonstrates that the LSI-adjusted rates are an appropriate measure of the prevailing community rates for attorneys in the Washington, D.C. area.

---

[8] The *SOCM* court also addressed a concern particularly salient to IDEA litigation, where much of the fact finding is, due to the statutory scheme, accomplished on the administrative level.  *See* 20 U.S.C. § 1415(f) (establishing procedures for "due process hearing[s]," which are "conducted by the State educational agency or by the local agency" before an impartial hearing officer).  In *SOCM*, the D.C. Circuit noted that "reduced profit public interest lawyers often acquire particular experience and expertise in specific public interest areas."  *SOCM*, 857 F.2d at 1521.  The court recognized that if full reimbursement at the prevailing community rate were not allowed for such lawyers, "expertise in a specific area is likely to be found only in the firms which customarily represent" the larger public and for-profit interests "who regularly litigate against public interest groups."  *Id.*  In the IDEA context, reduced attorneys' fees awards for those practitioners who have developed expertise representing children with special educational needs would likely cause the "benefit of expertise [to be] lost," which the *SOCM* court highlighted as a reason to avoid using a rate other than the community rate in the lodestar calculation.  *See id.*

The Court is cognizant that, in evaluating attorneys' fees awards in litigation where the government is the non-prevailing party, these payments come from the public fisc.  Such concerns have been stated in the opinions of other judges in this court when applying the USAO matrix instead of the LSI-adjusted matrix.  *See, e.g.*, *Heller*, 832 F. Supp. 2d at 47–48. Nevertheless, Supreme Court and D.C. Circuit precedent is clear that such concerns are not legally cognizable reasons for reducing an attorney's fee award in civil rights litigation.  *See SOCM*, 857 F.2d at 1524 (endorsing the "prevailing market rate method" for all attorneys' fees awards under federal fee-shifting statutes).  Congress has recognized and addressed attorneys' fees, particularly in District of Columbia IDEA litigation, in the past.  *See Blackman v. District of Columbia*, 633 F.3d 1088, 1089 (D.C. Cir. 2011) (noting Congress was "concerned about the substantial cost to the District" of attorneys' fees in IDEA litigation and made "a series of attempts at capping the fees awarded").  In the absence of Congressional action, this Court must calculate attorneys' fees awards using the most reasonable hourly rate, and that rate is determined by the prevailing community rate, regardless of the ultimate source of the payments.

The plaintiff's objection to the R&R's rejection of the LSI-adjusted matrix is sustained.

## 2.    *Application Of The LSI-Adjusted Matrix To IDEA Cases*

The conclusion that the LSI-adjusted matrix sets the appropriate prevailing legal billing rate in this community leads next to the question of whether the Court should exercise its discretion and apply that rate here.  The defendant's position is that some hourly rate even lower than the USAO Matrix applies in this case since those rates were "created for litigators who practice 'complex federal litigation in the District of Columbia.'"  Def.'s Opp'n at 2; *see also id.* at 1 n.1 (USAO matrix shows "prevailing attorneys' hourly rates for <u>complex federal litigation</u> in

the District of Columbia") (emphasis in original).[9]   The R&R similarly concluded that "the maximum *Laffey* rates for complex federal litigation are not appropriate," and recommended a reduction "to seventy-five percent of *Laffey* rates," since this case did not present "novel legal issues" and was not "significantly more complex than most IDEA cases."   R&R at 10.   The underlying premise of this view is that IDEA cases do not represent sufficiently complex federal litigation to warrant the presumptive use of the USAO matrix as the prevailing market rate, let alone the LSI-adjusted rates requested by the plaintiff.   Clearly, the "lodestar" method of determining the reasonable hourly rate turns, in part, on the type of "substantive legal issues raised in the case."   *Laffey*, 572 F. Supp. at 371 n.30.   To assess the validity of the twenty-five percent reduction in the USAO matrix rates for IDEA litigation recommended in the R&R and challenged by the plaintiff in this case, the Court reviews the development of the caselaw, including recent Supreme Court precedent, regarding ascertainment of the reasonable "lodestar" hourly rate in this type of civil rights case.

### a)   Laffey *And Its Progeny*

*Laffey v. Northwest Airlines, Inc.* involved a Title VII action brought by a class of plaintiffs consisting of "more than 3,300 women employed by Northwest Airlines" spanning more than a decade.   *See Laffey v. NW Airlines, Inc.*, 746 F.2d 4, 7 (D.C. Cir. 1984).   After nearly a decade of litigation, the plaintiffs achieved "significant injunctive relief" and an award of $52 million.   *Id.*   With respect to attorneys' fees, "the parties differed radically . . . on how the reasonable hourly rates should be set."   *Id.* at 8.   The district court rejected the defendant's argument that "the plaintiffs' attorneys should be restricted to their own market rates," instead

---

[9] For example, the defendant suggests that $90 per hour would be an appropriate rate at which to award attorneys' fees for IDEA litigation since this is the rate at which the D.C. Superior Court pays attorneys appointed "to represent indigent clients in Family Court matters."   Def.'s Opp'n at 4.   The defendant fails to detail any similarities between family court proceedings and federal court litigation under a complicated statutory regime involving both administrative and federal court proceedings.   In short, this suggestion is so conclusory as to be spurious.

awarding them "'prevailing market rates' based on a matrix drawn from the rates charged by other attorneys." *Id.* at 10.  This matrix, which came to be known as the *Laffey* matrix and is the basis for the current USAO matrix, *see* USAO matrix ¶ 2, was compiled as a general survey of prevailing rates in this community for highly skilled federal litigators in employment discrimination cases or other complex federal litigation.  *See Laffey*, 572 F. Supp. at 371. Notably, the court described the plaintiffs' view that "the rates stated in the matrix are conservative." *Id.* at 372 n.33.[10]  On appeal, the D.C. Circuit partially overturned the district court's opinion in *Laffey*, holding that the correct way to determine a reasonable fee for a law firm was to calculate the lodestar "according to the market rates established by those firms in their everyday practice." *Laffey*, 746 F.2d at 30.

The holding that resulted in the partial reversal in *Laffey* was short-lived.  In *SOCM,* decided only four years later, the D.C. Circuit considered application of the fee-shifting provision of the Surface Mining Control and Reclamation Act, 30 U.S.C. § 1270(d), and overruled its decision in *Laffey* and applied the prevailing market rate, even if the attorneys involved did not normally charge those rates for non-economic reasons.  *SOCM*, 857 F.2d at 1524–25.  The court recognized that Congress' intent with regard to civil rights litigation was "not simply . . . that the fees would attract counsel, but rather that they would be 'adequate to attract *competent* counsel.'" *Id.* at 1521 (emphasis in original, citation omitted).  While Congress wished to avoid "windfalls" for attorneys in fee-shifting cases, the court observed that "[i]t is not inconsistent with the avoidance of windfalls to pay attorneys at rates commensurate with prevailing community standards of attorneys of like expertise doing the same sort of work in the same area." *Id.*  While, as noted, the *SOCM* court sanctioned the use of the *Laffey* matrix in fee-

---

[10]  The court called the matrix rates "generous" by comparison to the rates normally charged by the plaintiff's firm. *Laffey*, 572 F. Supp. at 374.

shifting cases as the presumptive "prevailing market rate" for legal services, notably absent is any discussion of the complexity of the underlying litigation as a prerequisite for obtaining these rates.[11]  Rather than limiting the application of the *Laffey* matrix to only those cases deemed "complex Federal litigation," the *SOCM* court "commend[ed]" that fee schedule more broadly as the "prevailing community rates."  *Id.* at 1525.

After the D.C. Circuit sanctioned the use of the *Laffey* matrix in *SOCM*, the next major case addressing the prevailing community rates for attorneys in civil rights litigation was *Covington*, which involved a consolidated appeal of three civil rights cases, one pertaining to prisoners' rights, one pertaining to the First Amendment, and one pertaining to discrimination, under 42 U.S.C. § 1988.  *Covington*, 57 F.3d at 1103.  Although *Covington* mentions that the plaintiffs in that case "submitted data demonstrating their attorneys' experience in the legal profession and in litigating complex federal court cases" and that "plaintiffs submitted a great deal of evidence regarding prevailing market rates for complex federal litigation," the *Covington* court never stated that the cases at bar needed to meet some sort of threshold determination of complexity before the *Laffey* rates would apply.  *Id.* at 1110.

Moreover, legal complexity was not one of the bases highlighted by the Court to challenge a prevailing party's request for attorneys' fees.  The D.C. Circuit explained that to overcome the presumptive prevailing market rate, the non-prevailing party must typically "provide specific contrary evidence tending to show that a lower rate would be appropriate."  *Id.* at 1110 (quoting *Concerned Veterans*, 675 F.2d at 1326).  Such evidence could include a

---

[11] The D.C. Circuit in *SOCM* repeated the twelve factors articulated in the influential case of *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974), to determine the reasonable hourly rate or lodestar.  857 F.2d at 1521–22.  These factors do not list "complexity of the litigation," but do refer to the somewhat analogous consideration of "[t]he novelty and difficulty of the question" at issue, yet the D.C. Circuit certainly did not highlight that particular factor in any way.  *Id.* at 1522.  Rather, the court merely noted that the *Johnson* factors had been cited with approval in a Congressional report but questioned the relevance of all of the *Johnson* factors in determining the lodestar amount.  *Id.* (noting "dispute . . . as to which, if any, of the *Johnson* factors may be considered for purposes of multiplication rather than in the original lodestar computation.").

showing that "under no circumstances would that particular plaintiff's attorney ever command the rates he or she requests[,]" "the plaintiff attorneys' claims as to their competence, experience, reputation, or performance in the instant case" were unjustified; or a "challenge [to] the plaintiff attorneys' market data in an effort to show that the submitted market rates are inaccurate." *Id.* at 1110. Indeed, rather than cordoning off certain types of federal litigation, such as IDEA cases, as warranting lower billing rates, the court rejected the defendant's argument that "the court should define the relevant market, for purposes of determining the prevailing market rates, narrowly, as including only plaintiff attorneys in civil rights, employment, or discrimination actions." *Id.* at 1111.

Thus, there are clear signals in *Laffey*, *SOCM*, and *Covington* that some version of the *Laffey* matrix is presumptively reasonable in civil rights litigation—and the enforcement of rights under the IDEA qualifies as civil rights litigation— and that a complexity determination is not the dispositive question as to whether such rates apply. Nevertheless, even if complexity were a touchstone determination, nothing in *Laffey*, *SOCM*, or *Covington* indicates that IDEA cases, as a subset of civil rights litigation, fail to qualify as "complex" federal litigation. Indeed, IDEA cases often involve an administrative proceeding, followed by a federal proceeding, followed by another administrative proceeding, each of which may provide an opportunity for the submission of new evidence and *de novo* review of substantive claims under federal law. [12]

The defendant points to several cases from this jurisdiction involving the IDEA or other civil rights laws in which the court has awarded attorneys' fees at a reduced level, generally a twenty-five percent reduction from the USAO matrix. *See, e.g.*, *Rooths v. District of Columbia*,

---

[12] Where the merits of an IDEA case have been resolved administratively and the litigation in federal court is limited to a dispute over attorneys' fees, courts have regarded the USAO matrix rates as inapplicable. *See, e.g.*, *Agapito v. District of Columbia*, 525 F. Supp. 2d 150, 155 (D.D.C. 2007) (denying award of full USAO matrix rates where only the amount of attorneys' fees were subject to litigation at the federal level).

802 F. Supp. 2d 56, 62 (D.D.C. 2011) (characterizing the *Laffey* rate as the "presumptive

maximum rates" for civil rights litigation, the court reduced IDEA attorney's fee by twenty-five

percent from USAO matrix where the case "involved very simple facts, little evidence, and no

novel or complicated questions of law" );[13] *Sykes v. District of Columbia*, 870 F. Supp. 2d 86, 94

(D.D.C. 2012) (reducing IDEA attorney's fee by twenty-five percent from USAO matrix, which

the court found were "inapplicable as prevailing market rates" because that matrix applied to

complex federal litigation while "IDEA litigation [] is *not* complex federal litigation because

most if not all of the attorney's fees in question are the result of counsel's preparation for

attendance at routine administrative hearings") (emphasis in original); *Davis v. Dist. of

Columbia*, 864 F. Supp. 2d 110, 117 (D.D.C. 2012) (same); *Muldrow v. Re-Direct, Inc.*, 397 F.

Supp. 2d 1, 4–5 (D.D.C. 2005) (reducing attorney's fee by twenty-five percent from the USAO

matrix in a Section 1983 civil rights action because the court deemed case insufficiently

complex); *Wilson v. District of Columbia*, 777 F. Supp. 2d 123, 127 (D.D.C. 2011) ("[T]he

Laffey Matrix is not generally applicable to IDEA cases because they are not usually complex.");

*McClam v. District of Columbia*, 808 F. Supp. 2d 184, 190 (D.D.C. 2011) (noting "IDEA cases

are not generally complex").

The problem with declining to apply market legal services rates due to the non-

complexity of the case was made plain in *Young v. District of Columbia*, 893 F. Supp. 2d 125

(D.D.C. 2012), another IDEA attorneys' fees case.  There, the court rejected a reduction of

---

[13] The R&R likewise states that "[t]he *Laffey* Matrix contains presumptive maximum rates," R&R at 9, citing *Laffey*, 572 F. Supp. at 374, for this proposition.  The derivation of this proposition is unclear since the district court in *Laffey* explained that the plaintiffs in that case viewed the *Laffey* rates to be a conservative estimate of the prevailing community billing rate for attorneys' fees in civil rights litigation, *id*. at 372 n.33, and although the court acknowledged that the rates were "generous," expressly noted "that lawyers with comparable qualifications and expertise actually bill their clients—and receive remuneration—in cases of this sort at rates that are similar to (and, in some instances, *higher than*) the hourly rates Plaintiffs propose," *id*. at 374 (emphasis supplied).  Thus, the *Laffey* rates were intended to be nothing more than "those that prevail in the community for similar work," and not necessarily the maximum rate.  *Id*. at 375.

*Laffey* rates even though the defendant had argued "that the *Laffey* rates should be reduced here 'to account for the relative brevity and lack of complexity of the underlying proceedings.'" *Young*, 893 F. Supp. 2d at 131.  The court noted that "[s]ince the total fee amount is determined by multiplying the number of hours expended by the rate, reducing the *Laffey* rates because of the brevity of the proceedings would account for the length of the proceedings twice." *Id.*  This rationale applies equally to the complexity determination: less complex cases take less time to resolve.  Therefore, the complexity of the case is accounted for by the number of hours expended and should not be accounted for by a blunt reduction of rates before applying the rates to the number of hours expended.  Indeed, it is this fundamental logical failing in those decisions unilaterally reducing the *Laffey* rates that was recently rejected by the Supreme Court.

*b.*     *Supreme Court Guidance in* Perdue

The Supreme Court recently addressed fee litigation in *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010), a civil rights case where the plaintiff sought a fee enhancement over and above the lodestar rate based on "superior work and results." *Perdue*, 559 U.S. at 548.  Although the instant case raises the question of when rate reductions should be applied, the reasoning in *Perdue* is equally applicable to enhancements or reductions.  The Court began its analysis by noting two unassailable facts: that "there is a strong presumption that the lodestar is sufficient," *id.* at 546, and that Congress allowed attorneys' fees in civil rights cases "to ensure that federal rights are adequately enforced."  *Id.* at 550.  The Supreme Court went on to explain that the purpose of the lodestar is to "produce[] an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case."  *Id.* at 551 (emphasis in original).  At its heart, the

lodestar approach is designed to be "objective" and to "cabin[] the discretion of trial judges, permit[] meaningful review, and produce[] reasonably predictable results." *Id.* at 552.

In analyzing the salient features of the lodestar method, namely, multiplying the number of hours expended by the reasonable hourly rate, the Supreme Court explained that "the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable attorney's fee'." *Id.* at 553 (quoting *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 566 (1986) ("*Delaware Valley I*")).  Most importantly for IDEA cases, the Court held that "the novelty and complexity of a case generally may not be used as a ground for an enhancement because these factors 'presumably [are] fully reflected in the number of billable hours recorded by counsel.'" *Id.* (brackets in original).  The Supreme Court also noted that specific evidence supporting an enhancement "is essential if the lodestar method is to realize one of its chief virtues, *i.e.*, providing a calculation that is objective and capable of being reviewed on appeal." *Id.*

Thus, two themes are evident from *Perdue*: that the lodestar method generally takes into account all relevant factors related to an attorneys' representation and that the primary objective of the lodestar method is predictability and the cabining of district court discretion.  The Supreme Court went on to strike down the district court's award of an enhancement in *Perdue* for violating these two principles.  *Id.* at 560.  As for predictability, the Supreme Court questioned the district court for enhancing an award by seventy five percent: "[A]s far as the court's opinion reveals, this figure appears to have been essentially arbitrary.  Why, for example, did the court grant a 75% enhancement instead of the 100% increase that respondents sought? And why 75% rather than 50% or 25% or 10%?" *Id.* at 557.  The Supreme Court stressed the importance of "provid[ing] a reasonably specific explanation for all aspects of a fee

determination, including any award of an enhancement," noting "when a trial judge awards an enhancement on an impressionistic basis, a major purpose of the lodestar method—providing an objective and reviewable basis for fees—is undermined."  *Id.* at 558 (internal citation omitted). The Court further cautioned that absent "such an explanation," "adequate appellate review is not feasible, and without such review, widely disparate awards may be made, and awards may be influenced (or at least may appear to be influenced) by a judge's subjective opinion regarding particular attorneys or the importance of the case."  *Id.*

Set against the backdrop of this recent cautionary guidance from the Supreme Court, shaving significant percentages of up to twenty-five percent from the prevailing market rate in calculating attorneys' fees awards under the fee-shifting provision of a civil rights law, such as the IDEA, requires clear, specific, and persuasive explanation.  The R&R justified the rejection of the LSI-adjusted rate proposed by the plaintiff and application of a twenty-five percent reduction from the USAO matrix because "the number of exhibits and witnesses reveals this case was not more complicated than most IDEA hearings," "the maximum *Laffey* rates for complex federal litigation are not appropriate," and relied on other cases from this district applying a similar percentage reduction.  R&R at 10.  As the preceding discussion has demonstrated, consideration of "complexity" is already incorporated into the reasonableness of the number of hours spent on the matter.  Once that consideration is set aside as insufficient justification for a reduction, the defendant has not explained why litigating federal IDEA cases generally, or this case in particular, should warrant a reduction of twenty-five percent from the prevailing market rate compared to litigating of other civil rights cases with fee-shifting provisions.  Unless such an explanation is given, a twenty-five percent reduction from the market rate appears to be "essentially arbitrary" and subject to the same question the Supreme Court asked in *Perdue*:

"Why, for example, did the court grant a [25% reduction] instead of the [reduction] that respondents sought? And why [25%] rather than 50% . . . or 10%?" *Perdue*, 559 U.S. at 557. In short, the defendant has not provided a sufficient basis to overcome application of the presumptive market rate.

*       *       *

The lodestar method is designed "in virtually every case already [to] reflect all indicia of attorney performance relevant to a fee award." *Id.* at 561 (Thomas, J. concurring). The Court declines to apply what appears to be an essentially arbitrary reduction of twenty-five percent to the lodestar rate due to a perceived lack of complexity in this type of civil rights litigation. *See id.* at 558. Complex cases take more hours to litigate while simple cases take fewer hours. *See id.* at 553. Thus, by reducing the rate at which those hours are reimbursed, courts are effectively double counting the complexity factor for civil rights attorneys practicing in the IDEA area: first for the number of hours expended and then by further reducing that rate. This is not the method the Supreme Court has approved and it is not the method this Court will follow.

The defendant has, with only the two exceptions discussed below, not challenged the reasonableness of the hours expended in this case by the plaintiff's attorney, nor did the R&R find those hours to be unreasonable.

Since the complexity of the case is adequately accounted for by the number of hours expended, the plaintiff's objection to the R&R's awarding of only seventy-five percent of the *Laffey* matrix rates is sustained.

**C.      The "Fees For Fees" Award**

The parties raise two issues regarding the fees related to preparing and litigating the fee petition. The defendant argues that such fees are entirely improper under the IDEA, while the

plaintiff argues that the R&R's recommended fifteen percent reduction for the number of hours spent preparing a reply to the defendant's opposition to the plaintiff's fee petition was unnecessary.  The Court addresses each objection in turn.

### 1.    *Fees For Fees Under The IDEA*

The defendant raises the novel argument that the Court is without power to award fees for litigation pertaining to attorneys' fees because the IDEA is a statute authorized by the Constitution's Spending Clause, U.S. Const. Art. I, § 8, cl. 1, and does not explicitly authorize such fees.  *See* Def.'s Objs. at 14–15.  The defendant's argument is unavailing.

In asserting this argument, the defendant relies on *Arlington Central School District Board of Education v. Murphy* ("*Arlington*"), 548 U.S. 291, 294 (2006), where the Supreme Court considered whether the IDEA authorizes reimbursement of the fees charged by an expert, non-lawyer, educational consultant as "costs."  In resolving this question, the Court recognized that "Congress enacted the IDEA pursuant to the Spending Clause," which requires any conditions attached "to a State's acceptance of federal funds [to]…be set out 'unambiguously.'"  *Id.* at 296 (internal quotations and citations omitted).  Since "States cannot knowingly accept conditions of which they are unaware or which they are unable to ascertain," the Court set out the following test for authorized reimbursements under the IDEA: "whether such a state official would clearly understand that one of the obligations of the Act is the obligation to compensate prevailing parents for expert fees," or, in other words, "whether the IDEA furnishes clear notice regarding the liability at issue in this case."  *Id*.  The Court rested its conclusion that prevailing parents are not entitled to recover expert fees in IDEA actions on several grounds, including that (1) "'costs' is a term of art that generally does not include expert fees," *id*. at 297; (2) expert fees are not listed among the costs recoverable in the general statute, 28 U.S.C. § 1920, governing the taxation of costs in federal court, *id*. at 298; and (3) the Court's interpretation of "nearly identical

language in" another statute in a prior case as not covering expert fees, *id.* at 302–03.  Notably, central to the Supreme Court's reasoning was the view that "attorneys' fees" were explicitly included in the statute, but "expert fees" were not.  *Id.* at 298.

The defendant attempts to apply the reasoning in *Arlington* to the attorneys' fees context by drawing a distinction between "discretionary fees for substantive actions and procedures," which the defendant argues are allowed under the statute, and "the non-substantive procedure of petitioning for fees."  Def.'s Objs. at 16. According to the defendant, the IDEA "proceedings" referred to in 20 U.S.C. § 1415(i)(3)(B),[14] are limited to administrative hearings and judicial proceedings but do not include attorneys' fees proceedings.  *Id.*  This creative approach to statutory interpretation is inconsistent, however, with this Circuit's precedent and *Arlington* itself.  First, the text of the IDEA simply does not differentiate between "discretionary attorneys' fees" and "non-substantive fees."  *See* 20 U.S.C. §1415(i)(3).  Second, the D.C. Circuit has made it clear that "fees for fees" are to be considered part of any reasonable attorneys' fee award.  *See, e.g.*, *New Jersey v. EPA*, 703 F.3d 110, 116 (D.C. Cir. 2012) (awarding attorneys' fees for time spent on fee petition); *Center for Biological Diversity v. U.S. Dep't of Interior*, 696 F.3d 1, 6 (D.C. Cir. 2012) (same); *Kaseman v. District of Columbia*, 444 F.3d 637, 640 (D.C. Cir. 2006) (holding attorneys' fees reimbursable under IDEA); *Sierra Club v. EPA*, 769 F.2d 796, 811 (D.C. Cir. 1985) ("The hours reasonably expended on [a fee] petition are compensable."); *Env't Def. Fund v. EPA*, 672 F.2d 42, 62 (D.C. Cir. 1982) ("*EDF*") (holding fees incurred for fee petition reimbursable); *Garvin v. Government of the District of Columbia*, 910 F. Supp. 2d 135, 138 (D.D.C. 2012) (same); *Wright v. District of Columbia*, 883 F. Supp. 2d 132, 134 (D.D.C. 2012) (same).  Indeed, the defendant does not cite a *single case* from any jurisdiction where fees for

---

[14] This provision provides: "In any action or proceeding brought under this section, the court, in its discretion, may award attorneys' fees as part of the costs."

fees were disallowed under the IDEA.  In the face of this overwhelming weight of Circuit

precedent the defendant merely states that this argument "has not previously [been] presented . . .

for the courts' consideration, nor have the courts in this jurisdiction addressed the issue of

whether the IDEA specifically authorizes courts to order fees-on-fees."  Def.'s Objs. at 16.  This

is not a sufficient counter-weight to overcome the binding precedent on this Court.

Finally, the rationale in *EDF* for why fees for fees fall within the ambit of "attorneys'

fees" is persuasive.  In *EDF*, the D.C. Circuit held that "the critical fact" was that the plaintiff

"was required to seek a court award of attorneys' fees" under the applicable statute.  *EDF*, 672

F.2d at 62.  "The attorneys' fee question has, as a consequence, become one of the issues of the

case.  [The plaintiff], therefore, should be entitled to receive just attorneys' fees for time

reasonably expended to resolve the matter in dispute if the court otherwise determines such fees

to be appropriate."  *Id.*  Here, the same principle applies: once the defendant chose to fight the

awarding of attorneys' fees, it made those attorneys' fees an issue in the case and, consequently,

reimbursable as "attorneys' fees" because the attorneys' fees are just another issue in the

litigation.

*Arlington* counsels no different result.  There, the Supreme Court rejected the argument

that a *non-attorney's* expert fees could be considered "costs," in part, because "costs" is "a term

of art that generally does not include expert fees."  *Arlington*, 548 U.S. at 297 (internal quotation

marks omitted).  By contrast, when it comes to attorneys' fees, which is also a term of art, the

award of fees incurred in connection with a fee petition was established in this Circuit in *EDF* at

least three years before the 1986 enactment of the attorneys' fees provision in the precursor

statute to the IDEA.  *See EDF*, 672 F.2d at 62 (noting "time reasonably devoted to obtaining

attorneys' fees in the context of litigation where the court must be petitioned for such an award is

itself subject to an award of fees"); *Bd. of Educ. of E. Windsor Reg'l Sch. Dist. v. Diamond in Behalf of Diamond*, 808 F.2d 987, 994 (3d Cir. 1986) (noting Congress added "a provision for attorneys' fees" to the Handicapped Children's Protection Act of 1986, the precursor to the IDEA, that took effect on August 5, 1986). Thus, unlike the expert consultant fees at issue in *Arlington*, which the Supreme Court found no reasonable state official would equate with "costs," at the time the attorneys' fees provision in the IDEA was passed in 1986, it was already established law in this Circuit that fees for fees were rightfully considered "attorneys' fees." Consequently, the award of fees incurred in connection with fee petitions meet the test articulated by the Supreme Court in *Arlington*, since "a state official would clearly understand that one of the obligations of the Act is the obligation to compensate prevailing parents for" such fees. *See Arlington*, 548 U.S. at 296

The defendant's objection to the award of fees for fees is overruled.

**2.      *The Reasonableness Of Plaintiff's Time Spent Preparing Her Reply***

The plaintiff objects to the R&R's finding that the twenty-one hours the plaintiff's counsel spent preparing a reply to the defendant's opposition to the fee petition was an "exorbitant" number of hours and should be reduced by fifteen percent. *See* R&R at 8. The plaintiff argues that the R&R provides no rationale for this reduction and explains that the defendant's opposition included seven separate argument points, one of which cited approximately fifty cases. *See* Pl.'s Objs. at 6. The defendant, in fact, admits that the arguments it raised about the propriety of *any* fees incurred after a plaintiff obtained a final order, i.e., fees for fees, had not been raised before any other court in this district. Def.'s Objs. at 16. Thus, even an experienced attorney, such as the plaintiff's counsel, would reasonably be expected to spend additional time responding to such admittedly novel arguments. Moreover, the plaintiff is correct that the R&R apparently failed to consider the length, intricacy, and novelty of the legal

arguments involved in responding to the defendant's eighteen page opposition memorandum. *See* R&R at 8 (noting only that "it is exorbitant to suggest that twenty-one hours is necessary to file a reply to a motion for attorney's fees."). Thus, the Court finds that, in this context, twenty-one hours to research and draft a reply to the defendant's opposition to the fee petition is not unreasonable.

The plaintiff's objection to the R&R's finding on the number of hours spent on the reply memorandum is sustained.

### D. The Time Spent At Purported "Resolution Session"

The plaintiff's final objection to the R&R is the recommendation to disallow one-half hour of time for a "Resolution Session" held on September 27, 2010. While the plaintiff acknowledges that the IDEA specifically bars attorneys' fees for such sessions, *see* 20 U.S.C. § 1415(i)(3)(D)(ii), the plaintiff disputes whether the session, which she calls a "settlement meeting," met the statutory prerequisites. *See* Pl.'s Objs. at 7. The IDEA requires that "[p]rior to the opportunity for an impartial due process hearing . . . the local educational agency shall convene a meeting with the parents and the relevant members of the IEP Team who have specific knowledge of the facts identified in the complaint . . . (II) which shall include a representative of the agency who has decisionmaking authority on behalf of such agency . . . (IV) where the parents of the child discuss their complaint, and the facts that form the basis of the complaint, and the local educational agency is provided the opportunity to resolve the complaint." 20 U.S.C. §§ 1415(f)(1)(B)(i).

The plaintiff described the meeting under oath during the administrative hearing, stating that the meeting at issue lasted "less than 5 minutes." Admin. Record Transcript ("Tr.") at 87:1-2, ECF No. 9-8. The plaintiff recounted that at the meeting, the defendant's representative stated

"she didn't have a placement.  She didn't have anything for us and she would get back with it.

And that was the end of the meeting."  *Id.* at 87:2–4.  The plaintiff further testified that at the

meeting, the defendant's representative did not "give [her] or [her] attorney any opportunity to

review what [she] was requesting" and the defendant's representative was the person who ended

the meeting.  Tr. at 93:10–15.[15]  The plaintiff's description of the meeting was not refuted or

disputed at the administrative hearing.  *See* Tr. *generally.*

      The defendant does not now assert that this meeting was, in fact, a procedurally valid

"Resolution Session" for the purposes of the IDEA.  *See* Def.'s Opp'n at 7–9.  Rather, the

defendant contends that, because the plaintiff did not raise this issue at the administrative level,

to do so now "would be an inappropriate end run around the due process set forth in the IDEA."

*Id.* at 7.  This argument ignores the basic fact, pointed out by the plaintiff, that the procedural

validity of the September 27, 2010 "Resolution Session" was not at issue in the underlying

administrative proceeding.  *See* Pl.'s Reply to Def.'s Resp. to Pl's Objs at 2, ECF No. 39.

      The R&R appears to base the conclusion that the resolution session was procedurally

valid on the fact that the hearing officer referred to the session as a "resolution session."  *See*

R&R at 7; AR at 3 ("A resolution session was convened on September 27, 2010, but no form

was completed.").  This conclusory reference by the hearing officer is an insufficient basis to

find that a resolution session occurred, in the face of the undisputed contrary evidence presented

at the hearing about the insufficiency of the meeting to meet the procedural prerequisites.  The

plaintiff credibly asserts that the session did not meet the specific statutory requirements

necessary to render the time spent in the session ineligible for attorneys' fees because the

---

[15] The plaintiff expressly stated in her administrative complaint "that if DCPS does not send an agent with
settlement authority to a 'resolution meeting,' the petitioner will consider the meeting to be an informal settlement
discussion rather than a resolution session."  AR at 86; Pl's Reply Regarding Fees and Costs at 12, ECF No. 30.
While this provision in her administrative complaint does not carry any probative weight, the description of the
meeting itself confirms that the statutory requirements were not met.

representative from the defendant indicated to the plaintiff she had "nothing" for her and appeared unwilling to discuss the issues in the litigation.  Indeed, as noted, the defendant does not dispute the procedural insufficiency of the meeting and instead raises the red herring that the procedural validity of the session was not raised as an issue at the administrative hearing.  *See* Def.'s Opp'n at 7–9.  Consequently, the Court finds the plaintiff's objection effectively conceded by the defendant and orders reimbursement for the one-half hour spent in the meeting.

The plaintiff's objection is sustained.

## IV.    CONCLUSION

Other Judges within this Circuit have observed that the District of Columbia seems "perpetually unable to comply with IDEA's mandates" and that "parents have sought to enforce their rights in court—a situation IDEA contemplates, but one surely not intended to be the norm."  *Blackman*, 633 F.3d at 1095 (D.C. Cir. 2011) (Brown, J. concurring).  "Congress has focused on attorneys' fees, but fees are only a visible symptom of a more fundamental failure. The District is frequently unable to provide an adequate education for special needs children because the District struggles to provide an adequate education for any children."  *Id.*  This case is an example of the dysfunction in this critical system intended to provide educational opportunities for children with special educational needs.

Here, a child indisputably entitled to a FAPE was left with no school placement *at all* by the defendant, forcing the child's mother to secure private placement for the child so that the child could obtain an adequate education.  Rather than attempt to work with the parent, the defendant ignored the collaborative intent of the IDEA, as reflected in the five minute purported "Resolution Session," and fought the parent through an administrative hearing, a proceeding before this Court, and another administrative hearing.  After it was judicially determined that the

defendant was in error on virtually every point, the defendant spent ten months fighting the

plaintiff's motion for attorney fees and costs, which are specifically allowed by the IDEA for

those cases where the parent is a prevailing party.  In sum, the defendant has filed four separate

briefs, totaling sixty-two pages, including "novel" arguments contrary to the precedent in this

Circuit, in a vain effort to reduce the plaintiff's attorney's fee award by at least ninety percent.

The resources committed to this litigation effort may be better spent if re-focused on meeting the

requirements of the IDEA in the first instance.

      The Court sustains the plaintiff's objections to the R&R in full and overrules the

defendant's objections in full.  The Court finds that both the number of hours expended by the

plaintiff's attorney and the LSI-adjusted rates used to calculate the plaintiff's attorney's fees are

reasonable.  The defendant shall pay the full amount the plaintiff requested for her attorney's

fees, namely, $62,225.00, by December 16, 2013.[16]

      An appropriate Order accompanies this Memorandum Opinion.

      Date:  November 20, 2013

_____
BERYL A. HOWELL
United States District Judge

---

[16] The plaintiff's request for an order directing the defendant to "pay an additional $500.00 for each delay of a month or part thereof in payment," Pl.'s Mot. at 10, is denied.